IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FRANK LEON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 08 C 7430 |
| v. ) | |
| ) | Magistrate Judge Nan R. Nolan |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Frank Leon (Leon) appeals from an ALJ's decision denying him disability insurance benefits. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) and have filed cross-motions for summary judgment. Because the ALJ's decision is not supported by substantial evidence, the denial of benefits is reversed and this case is remanded for further proceedings consistent with this opinion.

**I.  Background**

Leon applied for disability insurance benefits on March 19, 2003, alleging he became totally disabled on August 28, 2001 because of spine, neck, cervical injury, cervical stenosis, and fibromyalgia (R. 176). Leon was born on November 16, 1954 and has a history of depression and neck and back pain resulting from several work-related injuries and accidents. Leon graduated high school and took two years of college level courses. The ALJ rendered a decision finding that Leon was not disabled because he was capable of performing past relevant work (R. 19-28).

Under the familiar five-step analysis used to evaluate disability, the ALJ found that Leon had not engaged in substantial gainful activity during at least the twelve month period elapsing after August 28, 2001 (step one); his degenerative disc disease of the cervical and lumbar spine and fibromyalgia are severe impairments (step two); but that they do not qualify as a listed impairment (step three). The ALJ determined that Leon retained the residual functional capacity to perform

light exertional work with the exceptions that he was not able to perform postural activities such as climbing, balancing, kneeling, crouching, and crawling more than occasionally, could not perform tasks that require bending to the floor more than rarely, and cannot perform any tasks that require twisting of the trunk. (R. 25). Given his RFC, the ALJ concluded that Leon was able to perform his past relevant work as a laboratory technician (step four).

## II. Discussion

Under the Social Security Act, a person is disabled if he has an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a). In order to determine whether a claimant is disabled within the meaning of the Act, the ALJ conducts a five-step inquiry: (1) whether the claimant is currently gainfully employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals any of the listings found in the regulations, see 20 C.F.R. § 404, Subpt. P, App. 1 (2004); (4) whether the claimant is able to perform his former occupation; and (5) whether the claimant is unable to perform any other available work in light of his age, education, and work experience. 20 C.F.R. § 404.1520(a) (2004); Clifford v. Apfel, 227 F.3d 863, 868 (7th Cir. 2000). These steps are to be performed sequentially. 20 C.F.R. § 404.1520(a). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." Clifford, 227 F.3d at 868 (quoting Zalewski v. Heckler, 760 F.2d 160, 162 n.2 (7th Cir. 1985)).

Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon a legal error. Stevenson v. Chater, 105 F.3d 1151, 1153 (7th Cir. 1997). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401

(1971). This Court may not substitute its judgment for that of the Commissioner by reevaluating facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. Estok v. Apfel, 152 F.3d 636, 638 (7th Cir. 1998).

The ALJ denied Leon's claim at step four, finding that Leon retains the residual functional capacity to perform a range of light work. Leon raises four main challenges to the ALJ's decision: (1) the ALJ did not adequately consider his depression; (2) the ALJ erred in rejecting Leon's somatoform disorder which led to an improper credibility finding; (3) the ALJ's residual capacity finding did not adequately account for the limitations in his abilities to stand and walk; and (4) the ALJ failed to consider the demands of Leon's past relevant work as a laboratory technician. There is merit to many of Leon's arguments such that a remand for further proceedings is necessary.

### A. ALJ's Evaluation of Leon's Depression

Leon first argues that substantial evidence does not support the ALJ's determination that his depression did not result in any functional limitations. (R. 24). In his findings, the ALJ explicitly noted Leon's underlying diagnosis of depression. (R. 24). The ALJ then proceeded to consider the extent to which Leon's depression caused functional limitations. See Craft v. Astrue, 539 F.3d 668, 674 (7th Cir. 2008) (holding that if the claimant has a medically determinable mental impairment, then the ALJ must document that finding and rate the degree of functional limitation in the areas of activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation). The ALJ found that Leon's depression "responded to treatment and did not cause more than mild limitations in any of the functional areas, including his ability to perform routine activities of daily living, maintain social functioning, and maintain concentration, persistence, or pace." (R. 24). The ALJ also determined that Leon has experienced no episodes of decompensation. Id. The ALJ stated that his conclusion was "based on claimant's excellent performance on cognitive testing, as pointed out by the medical expert, but also on his ready response to treatment." Id. Dr. Daniel Schiff, the testifying medical expert and a board certified

psychiatrist on whom the ALJ relied, testified that "there is insufficient consistent severe lasting evidence to be sure of any psychiatric diagnosis." (R. 675). Because the ALJ found that Leon's depressive disorder had not resulted in any functional limitations, she determined that it was not severe within the meaning of the regulations. See SSR 86-8 (noting an impairment is not severe if it is a slight abnormality or combination of slight abnormalities which would have no more than minimal effect on the individual's physical or mental ability to perform basic work activities).

Leon contends that the ALJ's findings as to his mental deficiencies is not supported by substantial evidence. More specifically, Leon argues that the ALJ did not accord the opinions of Drs. Sullivan, Beckstrand, and Wharton adequate weight. With respect to Dr. Sullivan, the ALJ noted that Leon received counseling from clinical psychologist Sullivan during November and December 2001. (R. 24). The ALJ then observed that Leon did not continue his counseling with Dr. Sullivan beyond December 2001, did not undergo a psychiatric evaluation, and was not placed on any psychogenic medications until 2003, when the evidence shows that he received five prescriptions for Buspirone and two prescriptions for Alprazolam (Xanax) from his internist. (R. 24).

According to Leon, he cannot be faulted for the failure to seek treatment after December 2001. Leon relies on SSR 96-7p, which prohibits an ALJ from drawing negative inferences about a claimant's failure to seek treatment without first considering explanations for the lack of medical care. The Commissioner responds by pointing out that Dr. Sullivan's records indicate Leon only had four appointments, all in November and December 2001, and he saw improvement in this interval (R. 299-302; 320-21; 345-47). Dr. Sullivan noted that Leon's "mood was elevated and he presented with less depressive symptoms" at the November 30, 2001 appointment. (R. 321). On his final appointment five days later, Leon appeared to be very relaxed both physically and emotionally after having been taught a muscle relaxation technique. Id.

An "individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints . . . ." SSR 96-7p. Before drawing inferences based on

a lack of treatment for mental health issues, Social Security Ruling 96-7p commands the ALJ to consider any reasons for Leon's failure to have gone back to Dr. Sullivan or seek any further mental health treatment. See SSR 96-7p (stating "[t]he adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek treatment."); see also Hill v. Astrue, 2009 WL 426048, at *9 n.5 (S.D. Ind. 2009) (then District Judge (now Court of Appeals Judge) David F. Hamilton noting that "[m]any individuals with mental health problems are hesitant to seek mental health treatment for legitimate reasons.").

Here, the ALJ erred by failing to follow SSR 96-7p. The ALJ did not question Leon about possible reasons for his lack of mental health treatment after December 2001 and she did not discuss any possible reasons in her decision. The record contains possible explanations for why Leon may not have sought further treatment for his depression. First, there is evidence that Leon may not have sought treatment for mental health issues because he was self-medicating his symptoms of depression with prescription medications. Leon has sought out and received care in the form of various prescription medications from various physicians for pain relief and anxiety. See (R. 555) (noting "[m]ultiple interventions have been tried including . . . Norco, Darvocet, Celebrex, Vioxx, Bextra, Naprosyn, Xanax, and Ativan."). The record also contains numerous references suggesting that Leon has a problem with prescription drug abuse or addiction. See (R. 293, 300, 320, 322, 382, 449, 561, 566, 568). For example, on August 9, 2005, Dr. Arnold notified Leon that she would no longer fill his Norco prescriptions because her office had discovered that Leon had several prescriptions for Norco with three different doctors during the same time period. (R. 568). At the November 14, 2007 hearing, Leon testified that he was taking Cymbalta, Xanax, Soma, Darvocet, and Norco. (R. 654). Dr. Schiff, the medical expert, confirmed that Leon's medication regime was "a lot." (R. 679). Dr. Schiff also explained that if you credit Leon's

testimony, he is using opiates in order to give himself enough relief to be functional. (R. 677); see also (R. 663) (Leon testified that the "only way [he] could get going was with medication."); (R. 473) (quoting Leon as stating, "I depend on pain medications to get me through.").

There is also evidence that Leon may be reluctant to admit his depression. As the Ninth Circuit has recognized, "it is common knowledge that depression is one of the most underreported illnesses in the country because those afflicted often do not recognize that their condition reflects a potentially serious mental illness." Nguyen v. Chater, 100 F.3d 1462, 1465 (9th Cir. 1996). In March 2003, Leon explicitly denied being seen by a doctor for emotional or mental problems despite mental records otherwise. (R. 178); see also (R. 194) (stating Leon "denied any emotional issues but there is a . . . report from an examination by a clinical psychologist in the medical records he submitted."). In December 2003, Dr. Beckstrand found that Leon "tends to under-report his feelings of depression . . . The claimant makes an effort not to complain frequently and frequently will downplay his symptomatology so as not to worry his loved ones." (R. 479). Moreover, Leon has been diagnosed with somatoform disorder, which is characterized by patients who are "over-focused on the physical symptoms and are lacking insight on their psychological difficulties." See http://en.wikipedia.org/wiki/Somatization_disorder. These possible explanations should have been taken into consideration by the ALJ before discounting the severity of Leon's depression due to lack of mental health treatment post-December 2001.

Leon next challenges the ALJ's rejection of Dr. Beckstrand's opinion. On December 11, 2003, Leon was examined by Karen Beckstrand, PsyD, a consultative examiner for the Social Security Administration (R. 472-79). After meeting with Leon, Dr. Beckstrand found that Leon was "experiencing significant symptomatology consistent with a diagnosis of Major Depressive Disorder." (R. 479). Dr. Beckstrand noted that Leon had described feelings of hopelessness, helplessness, suicidality, poor appetite, poor sleep and difficulty with concentration. Id. Dr. Beckstrand also indicated that Leon's level of depression had impaired his abilities to make social

connections and to concentrate on and understand directions. Specifically, Dr. Beckstrand found that Leon's ability to concentrate on and understand directions was fair. Id. She noted that at times, Leon may have difficulty with higher level processing tasks like interpretation and analysis, but he is capable of responding to concrete requests. Id. Dr. Beckstrand also determined that Leon's ability to respond to co-workers and supervisors was likely appropriate, provided requests do no exceed his physical limitations, but his ability to tolerate stresses in the workplace will be limited given his level of depression and his poor management of depressive symptomatology (i.e. eating, sleeping). Id.

The ALJ gave little weight to consultative examiner Dr. Beckstrand's assessment. The ALJ found that Dr. Beckstrand's findings applied "only to that particular moment in time and do not extend beyond the date of that examination" because Leon "had exhibited problematic behavior, as demonstrated by his persistent efforts to obtain pain medication from multiple treating sources." (R. 24). The ALJ also "noted" that Dr. Beckstrand's consultative examination was "administered for the purpose of establishing disability." Id.

The ALJ did not provide a satisfactory explanation as to why she limited Dr. Beckstrand's findings to "that particular moment in time." (R. 24). Dr. Beckstrand opined that Leon was experiencing "significant symptomatology consistent with a diagnosis of Major Depressive Disorder," including feelings of hopelessness, helplessness, suicidality, poor appetite, poor sleep and difficulty with concentration. (R. 479). The ALJ's rationale does not make sense because Leon's condition and these symptoms did not disappear the moment after the consultative examination was completed. Moreover, Leon's drug seeking behavior is not a sound basis for discounting Dr. Beckstrand's opinion. Dr. Beckstrand's report indicates that she was aware of some of Leon's use of prescription pain medication, which suggests that she accounted for this in her analysis and opinion. Dr. Beckstrand noted in her report that Leon stated that he depended on the "pain medications to get [him] through." (R. 473). Dr. Beckstrand also indicated that Leon

had been in individual therapy in the past to treat depression and break his dependence on pain medication. (R. 475-76). Furthermore, the ALJ's reference to "the fact that the examination was administered for the purpose of establishing disability" is not well-explained. If the ALJ believes that Dr. Beckstrand's credibility can be questioned because she performed the consultative examination at the request of the Bureau of Disability Determination Services, then the ALJ should have explained why the mere fact that a report is solicited is a legitimate basis for evaluating the reliability of the report. In any event, "in the absence of other evidence to undermine the credibility of a medical report, the purpose for which the report was obtained does not provide a legitimate basis for rejecting it." Reddick v. Chater, 157 F.3d 715, 726 (9th Cir. 1998) (cited in Moss v. Astrue 555 F.3d 556, 560 (7th Cir. 2009)).

Leon also asserts that the ALJ erred in determining that his depression did not result in any functional limitations by ignoring the conclusion of the state agency psychologist in December 2003. On December 22, 2003, Dr. M.A. Wharton, PsyD, opined that Leon suffered from major depression characterized by sleep disturbance, decreased energy, feelings of guilt or worthlessness, and difficulty concentrating or thinking. (R. 493, 506). Dr. Wharton further opined that Leon's cognitive and attentional skills were intact and adequate for simple one-two step work tasks but his depressive symptoms associated with his medical/physical problems moderately limit his ability to carry out detailed tasks. (R. 506). Dr. Wharton recommended a "moderate limitation of social expectations." Id. Dr. Wharton concluded that Leon's depression moderately restricted his activities of daily living, caused moderate difficulties in maintaining social functioning, and caused moderate deficiencies in concentration, persistence, or pace. (R. 500). At step two, the ALJ's analysis of Dr. Wharton's December 2003 findings consisted of one sentence: "It is noted that, although a State agency psychologist opined in December 2003 that the claimant had a severe mental impairment (Exhibit 13F), there is simply no longitudinal evidence that demonstrates the existence of a severe mental impairment on more than a sporadic, intermittent basis." (R. 25).

Social Security Ruling 96-6p provides that "[f]indings of fact made by State agency medical and psychological consultants and other program physicians and psychologists regarding the nature and severity of an individual's impairment(s) must be treated as expert opinion evidence of nonexamining sources at the administrative law judge and Appeals Council levels of administrative review. SSR 96-6p. In addition, "[a]dministrative law judges and Appeals Council may not ignore these opinions and must explain the weight given to these opinions in their decisions." Id.

There was no reversible error at step two regarding Dr. Wharton. Step two is a threshold determination which requires Leon to show only that he has one severe impairment. Hickman v. Apfel, 187 F.3d 683, 688 (7th Cir. 1999) (stating "it is quite apparent that severity is merely a threshold requirement."); Maggard v. Apfel, 167 F.3d 376, 378 (7th Cir. 1999) (stating "[t]he first two steps involve threshold determinations."). The ALJ's analysis of Dr. Wharton's findings was cursory, but the ALJ did not ignore Dr. Wharton's findings. The ALJ found Leon's degenerative disc disease of the cervical and lumbar spine and fibromyalgia severe at step two and the analysis proceeded through steps three and four. The ALJ's failure to be more expansive regarding Dr. Wharton's findings in her step two determination does not warrant a remand. See Morgan v. Astrue, 2009 WL 650364, *8 (N.D. Ill. Mar. 9, 2009) (stating "[t]he minimal articulation standard does not require the ALJ to cite and discuss every piece of evidence in detail at this threshold step, when the ALJ's finding was in plaintiff's favor. . . . '[A]s long as the ALJ proceeds beyond step two, no error can result from that analysis'").

Leon further challenges the ALJ's finding that he has experienced no episodes of decompensation. (R. 24). Leon argues that the ALJ should have found that he had one or two episodes of decompensation due to his depression based on Dr. Wharton's finding. Dr. Wharton found that Leon experienced one or two episodes of decompensation, each of extended duration. (R. 500). Morever, Dr. Beckstrand noted that Leon had described one episode of decompensation immediately following the death of an uncle. (R. 476). Dr. Beckstrand further noted that this was

an isolated incident that occurred about 5 years ago and not since. Id. The Commissioner makes no argument that the ALJ's decompensation finding is supported by substantial evidence or that any error in this finding is harmless. Because the ALJ did not articulate any reasoning for her finding of no episodes of decompensation or cite any supporting evidence, the Court cannot find that substantial evidence supports the ALJ's finding of no episodes of decompensation. On remand, the ALJ shall better articulate the grounds for her decision in this regard.

Leon's next argument is that the ALJ failed to consider the combined effects of his physical and psychological impairments in considering his RFC. "Having found that one or more of [claimant's] impairments are 'severe,' the ALJ needed to consider the *aggregate* effect of [the] entire constellation of ailments–including those impairments that in isolation are not severe." Golembiewski v. Barnhart, 322 F.3d 912, 918 (7th Cir. 2003); see also 42 U.S.C. § 423(d)(2)(B) (requiring consideration of the "combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of [sufficient] severity."); 20 C.F.R. § 404.1523. The Seventh Circuit has also made clear that an ALJ must consider psychiatric problems that may exacerbate a claimant's underlying physical impairments. Gentle v. Barnhart, 430 F.3d 865, 868-69 (7th Cir. 2005). In Gentle, the Seventh Circuit held that the claimant's depression and anxiety "required the administrative law judge's consideration, not because they are disabilities, but because they can make [her] underlying disability-restricted mobility as a result of spinal disk disease–more serious." Gentle, 430 F.3d at 868. When asked about the interaction between depression and pain, the medical expert in this case testified as follows: "They interact. Depressed folks can have more pain sensation, pain sensation can cause depression, and indeed, some of the literature would indicate that some of those tracks for the transmission of pain spill into the, the ability to not be depressed. There, there's there's some kind of neurological connection." (R. 680).

Even if Leon's depression was not severe in itself as the ALJ found, the ALJ was required to evaluate the aggravating effects of his depression on his physical impairments. The Commissioner emphasizes that the ALJ need only "minimally articulate" her reasoning. The Commissioner also states that "[a] commonsense reading of the decision indicates that the ALJ had to have considered the effects of Plaintiff's depression when she assessed his overall ability to function and work." Def's Memo. at 8. There is some question in this case whether the ALJ fully considered Leon's medical situation as a whole. The ALJ found at step two of the analysis that Mr. Leon's depression, though not severe, would cause mild limitations in maintaining concentration, persistence or pace, performing routine activities of daily living, and maintaining social functioning. (R. 24). Once she progressed past step two, the ALJ did not address these functional limitations caused by Mr. Leon's depression. The only mention of Leon's depression in the ALJ's RFC assessment consisted of her noting Leon's testimony that he was taking Cymbalta for treatment of his pain symptoms but that the medication had improved his outlook on life to the extent that he now attends family functions that he previously avoided, leaves the house more often than before, and no longer had thoughts of suicide. (R. 26). From the ALJ's brief analysis of Leon's depression when determining his RFC, the Court is unable to determine whether she analyzed the combined effect of Leon's depression and his other impairments. On remand, Leon is entitled to an express recognition from the ALJ that she adequately considered the impact of his depression on his degenerative disc disease of the cervical and lumbar spine and fibromyalgia, which the ALJ considered severe impairments.

**B.   Somatoform Disorder**

Another problem with the ALJ's opinion is her failure to adequately consider evidence of Leon's diagnosis of somatoform disorder. "The term 'somatoform disorder' refers to what used to be called 'psychosomatic' illness: one has physical symptoms, but there is not physical cause." Sims v. Barnhart, 442 F.3d 536, 537 (7th Cir. 2006). According to the Social Security Administration

regulations, somatoform disorder is characterized by "[p]hysical symptoms for which there are no demonstrable organic findings or known physiological mechanisms." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.07. On November 7, 2001, Dr. Sullivan, Leon's treating psychologist, indicated that Leon displayed symptoms of undifferentiated somatoform disorder. (R. 320). Dr. Victoria Santucci, whose clinic treated Leon for neck, low back, and leg pain, opined on December 14, 2001 that she "felt that Mr. Leon has undifferentiated somatoform disorder and that his physical complaints will not substantially improve until his drug dependence and psychological health are addressed." (R. 322). Relying on the medical expert's testimony, the ALJ rejected Drs. Sullivan's and Santucci's diagnosis of somatoform disorder. (R. 27). In concluding that Leon did not suffer from a somatoform disorder, the ALJ wrote:

> There are many credibility issues in this case as the claimant's subjective complaints of pain and limitation have always been far in excess of objective evidence, as noted by many examiners. Although there was a suggestion of a possible somatoform disorder by an examining physician in December 2001 [Dr. Santucci] to explain the claimant's drug seeking behavior, the medical expert testified that he was uncomfortable with that diagnosis. In this case, while there appears to be a medical basis for reporting pain sensations, the claimant's expression of pain are muddied by his clear effort for whatever reason to obtain excessive amounts of pain medication. Thus, his statements must be examined with great caution.

(R. 27). At the November 14, 2007 hearing, Dr. Schiff testified that "[t]he somatoform disorder is a diagnosis that's made by exclusion and I'm very uncomfortable with that diagnosis." (R. 677).

Leon contends that Drs. Sullivan and Santucci were treating physicians whose opinions are entitled to controlling weight. A treating physician's opinion is entitled to controlling weight if it is supported by objective medical evidence and is consistent with other substantial evidence in the record. 20 C.F.R. 404.1527(d)(2). The Seventh Circuit has explained in Hofslien v. Barnhart, 439 F.3d 375, 376 (7th Cir. 2006): "Obviously if [the treating physician's medical opinion] is well supported and there is no contradictory evidence, there is no basis on which the administrative law judge, who is not a physician, could refuse to accept it. Equally obviously, once well-supported

contradictory evidence is introduced, the treating physician's evidence is no longer entitled to controlling weight." Id. At that point, "the treating physician's evidence is just one more piece of evidence for the administrative law judge to weigh . . . . The [treating physician] rule goes on to list various factors that the administrative law judge should consider, such as how often the treating physician has examined the claimant, whether they physician is a specialist in the condition claimed to be disabling, and so forth. The checklist is designed to help the administrative law judge decide how much weight to give the treating physician's evidence. When he has decided how much actual weight to give it, there seems no room for him to attach a presumptive weight to it." Id. at 377. Moreover, an ALJ who discounts the opinion of the treating physician must articulate good reasons for doing so. 20 C.F.R. 404.1527(d)(2).

The Court cannot find, based on the current record, that the ALJ's decision to discount the opinions of two treating physicians in favor of the medical expert's opinion was based on substantial evidence. The ALJ's only reason for rejecting a diagnosis of somatoform disorder was based on Dr. Schiff's opinion that he was uncomfortable with that diagnosis, but that opinion was not adequately supported. Though Dr. Schiff testified that he was uncomfortable with a somatoform disorder diagnosis (R. 677), he did not explain the basis for his opinion which was in conflict with the opinions of two of Leon's treating physicians. Dr. Schiff did not address whether he has a general skepticism toward somatoform disorder or whether he based his opinion on his review of Leon's case.[1] A general skepticism toward somatoform disorder would not be a valid

---

[1] The Commissioner argues that Dr. Schiff was offering opinion based on the facts of Leon's case and not merely on a generally held belief about somatoform disorder because Dr. Schiff testified that he "cannot tease out a definitive trend either way in the record, at least, it's not consistently raised." (R. 677). It is not clear from the testimony whether Dr. Schiff was considering the issue of inadequate pain medication versus addiction or somatoform disorder when he stated that there was not a "definitive trend either way in the record." The Commissioner's further argument that the record does not contain a formal diagnosis of somatoform disorder is an improper post-hoc rationalization not offered by the ALJ as a basis for her rejection of a somatoform disorder diagnosis. Golembiewski, 322 F.3d at 916.

basis for discrediting the treating physicians' diagnosis. Somatoform disorder "is a well-attested phenomenon." Sims, 442 F.3d at 537. Without an explanation from Dr. Schiff as to why a diagnosis of somatoform disorder was suspect here, his testimony does not provide substantial evidence for the ALJ's rejection of the opinions of two treating doctors, one of which specializes in psychology. See Bauer v. Astrue, 532 F.3d 606, 608 (7th Cir. 2008) (holding ALJ violated the treating physician rule where ALJ relied on consultant that did not identify a flaw in the treating physicians' analysis but merely expressed a contrary view after reading the medical files); Gudgel v. Barnhart, 345 F.3d 467, 470 (7th Cir. 2003) (holding ALJ improperly credited medical expert's testimony over treating physician's opinion where ALJ did not adequately explain why the evidence in the record contradicts treating physician's diagnosis of post-polio syndrome).

Moreover, the ALJ's finding that Leon's complaints of pain were not credible because his "clear effort for whatever reason to obtain excessive amounts of pain medication" may represent a misunderstanding of the nature of somatoform disorder. One of the possible complications associated with somatoform disorder is addiction to prescription pain medication. See U.S. National Library of Medicine, http://www.nlm.nih.gov/medlineplu/s/ency/article/000922.htm. The ALJ failed to consider that a somatoform disorder may have been a reasonable explanation for Leon's request for pain mediation. On remand, the ALJ shall consider evidence of a somatoform disorder and reconsider Leon's credibility regarding his complaints of pain, including a possible psychological component of Leon's pain as well as the physical component. The ALJ shall also consider whether the evidence of addiction to prescription pain medication is consistent with a diagnosis of somatoform disorder.

### C. Residual Functional Capacity Assessment

The ALJ found Leon has the residual functional capacity to perform light work except that he is not able to perform postural activities such as climbing, balancing, kneeling, crouching, and crawling more than occasionally, he cannot perform tasks that require bending to the floor more than rarely, and he cannot perform any tasks that require twisting of the trunk. (R. 25). Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects up to 10 pounds. 20 C.F.R. § 404.1567(b). Light work includes jobs that require "a good deal" of walking or standing or jobs that involve "sitting most of the time with some pushing and pulling of arm or leg controls." Id. A job may also be considered light work if it requires "standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday" with intermittent sitting during the remaining time. SSR 83-10.

Leon argues that the ALJ erred in failing to note MRI results from August of 2004 indicating cervical and lumbar radiculopathy (nerve root disease). The ALJ need not provide "a complete written evaluation of every piece of testimony and evidence." Haynes v. Barnhart, 416 F.3d 621, 626 (7th Cir. 2005). In her decision, the ALJ adequately considered evidence of the August 2004 MRI testing even though the ALJ did not expressly mention the word "radiculopathy." The ALJ wrote:

> August 2004 MRI testing of the claimant's lumbar spine showed moderate endplate spurring at L5-S1 with moderately large posterior disc herniation that contributed to moderate central canal stenosis and abutted the left and right S1 nerve roots. MRI testing of the claimant's cervical spine revealed minimal-to-mild disc bulging at C3-4 and C4-5, moderate diffuse disc bulging and spondylosis causing mild-to-moderate central canal stenosis and mild bilateral neuroforaminal narrowing at C5-6 and C6-7.

(R. 23); see also (R. 578-83). The ALJ also expressly considered Dr. Erin Arnold's review of the August 2004 MRIs:

> In December 2004 the claimant was examined by a rheumatologist, Dr. Erin Arnold, who reported that the claimant had diffuse body pain and paraspinal muscle spasm of his cervicothoracic and lumbar spine. Although an x-ray showed that the

-15-

> claimant had a possible sacroilitis in the right sacroiliac joint, Dr. Arnold opined that the claimant's assertions of neck, back, and sacroiliac pain seemed to be out of proportion to the results shown on MRI tests.

(R. 23); see also (R. 555) (after reviewing the MRIs of the cervical and lumbar spine, Dr. Arnold opined that Leon's "pain, however, seems out of proportion to the findings on these examinations."). Because the results of the MRIs were clearly accounted for in the ALJ's decision, the ALJ did not err in failing to explicitly mention the MRIs' indication of cervical and lumbar radiculopathy (R. 23).

Leon claims that the ALJ also erred in selectively relying on portions of Dr. Saigal's reports in finding that he retained the capacity to perform full-time work while failing to mention Dr. Saigal's opinion that Leon should avoid standing or walking for more than half an hour at a time and should be limited to "sitting work." Although an ALJ many not selectively discuss only the evidence which favors her ultimate conclusion, again it is well-settled that an ALJ need not "provide a complete written evaluation of every piece of testimony and evidence." Haynes, 416 F.3d at 626; Smith v. Apfel, 231 F.3d 433, 438 (7th Cir. 2000). The ALJ found that Leon retained the residual functional capacity to stand and/or walk about 6 hours of an 8-hour workday. Leon faults the ALJ for failing to mention that: (1) in April and May 2001, Dr. Saigal authorized Leon to return to "sitting work" and (2) in October 2001, Dr. Saigal authorized him to return to work with a limitation on standing and walking greater than a half an hour at a time. (R. 414, 437, 448).

Leon fails to mention evidence from Dr. Saigal which showed significant improvement in his abilities to stand and walk after 2001. On January 7, 2002, Dr. Saigal noted that Leon's acute pain was "resolved." (R. 412). At that time, Dr. Saigal restricted Leon to lifting 10 pounds and advised him to avoid twisting and bending on a permanent basis. (R. 412). On February 13, 2002, Dr. Saigal similarly stated, "Frank can perform any work with [the] following restrictions: (1) 10 pounds weight restriction and (2) no twisting and bending on permanent basis." (R. 404). It is significant that, although Dr. Saigal earlier restricted Leon's standing and walking, he later failed to reiterate

that finding when issuing permanent work restrictions. Although Leon suggests that he should be limited to "sitting work" per Dr. Saigal's April and May 2001 reports, there is later evidence from Dr. Saigal which contradicts this assertion. On May 6, 2003, Dr. Saigal advised Leon to avoid prolonged sitting for greater than one hour. (R. 56).

In any case, the ALJ's decision regarding Leon's abilities to stand and walk is supported by substantial evidence, and the Court is able to trace the ALJ's reasoning in this regard. The ALJ took into account Leon's testimony that he was able to stand continuously for 20 minutes before experiencing severe pain in his leg and back and walk up to 2 blocks at a time. (R. 26). The ALJ correctly noted, however, that the record contains several assessments of Leon's residual functional capacity and none of those assessments restricted Leon's ability to stand or walk. (R. 26). An April 19, 2002 functional capacity evaluation determined that Leon demonstrated an ability to stand and walk "on a constant basis." (R. 267). On June 3, 2003, Dr. E.C. Bone found that Leon had the capacity to stand and/or walk for a total of about 6 hours in an 8-hour workday. (R. 451). A December 24, 2003 RFC assessment also indicated that Leon could stand and/or walk about 6 hours in an 8-hour workday. (R. 509).

    **D.**    **Step Four**

Leon's final argument is the ALJ erred in finding that Leon retained the mental capacity to perform his past work as a laboratory technician as generally performed in the national economy. Because the Commissioner's final decision is being remanded so the ALJ may re-examine Leon's mental condition and if necessary, re-evaluate his RFC and the step four analysis was based upon the RFC determination, the Court declines to reach the issue of whether the ALJ erred in determining that Leon retained the mental capacity to perform his past work.

**III.**    **Conclusion**

For these reasons, the ALJ's decision is reversed and this case is remanded for further proceedings consistent with this Opinion. Plaintiff's Motion for Summary Judgment [#13] is

granted, and Defendant's Cross-Motion for Summary Judgment [#21] is denied.  The Clerk is directed to enter judgment in favor of Plaintiff Frank J. Leon and against the Commission of Social Security.

E N T E R:

**Nan R. Nolan**
**United States Magistrate Judge**

**Dated:  March 5, 2010**